# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BYRON DUNN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION H-16-1760 |
| | § | |
| HUNTING ENERGY SERVICES *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for summary judgment filed by defendant National Coupling Company, Inc. d/b/a Hunting Energy Services ("NCC").[1] Dkt. 31. Additionally, plaintiff Byron Dunn filed numerous objections to evidence in his response to the motion for summary judgment. Dkt. 36. Having considered the motion, objections, response, reply, record evidence, and applicable law, the court is of the opinion that the objections should be SUSTAINED IN PART and OVERRULED IN PART and the motion for summary judgment should be GRANTED IN PART and DENIED IN PART.

## I. BACKGROUND

This case relates to Dunn's employment at NCC. Dkt. 1. Dunn started working for NCC as a service engineer in December 2013. Dkt. 31, Ex. A. He received a "very good" performance evaluation approximately sixty days after beginning work.[2] Dkt. 37-4 (performance evaluation). The person completing the evaluation form noted that he saw Dunn as a leader and that he was reliable

---

[1] NCC asserts that it is erroneously named Hunting Energy Services, Subsea Technologies Division in this lawsuit. Dkt. 31.

[2] The categories were "outstanding," "very good," "good," "improvement needed," and "unsatisfactory." Dkt. 37-4.

and completed tasks well. *Id.* There was, however, a notation made that Dunn "needed improvement" in "patience as pertaining to co-workers" and that there were some "ongoing issues" with regard to "2nd shift." *Id.* Nevertheless, the evaluator rated Dunn on the low end of "very good" on the "interpersonal relationships" factor of the evaluation. *Id.*

Dunn asserts that after this evaluation, he started performing various supervisory-type tasks and that it appeared he was being considered for a supervisor opening. Dkt. 36 (submitting evidence that Dunn was conducting interviews and was copied on emails to department employees). On March 6, 2014, when Dunn asked his facilities manager, John Coffman, if a choice on "the supervisor position" was forthcoming, Coffman responded, "LOL, come see me. Will cover this."[3] Dkt. 37-8. By April 11, 2014, Dunn still had not been promoted. Dkt. 36. He sent Coffman another email asking about getting "more involved with responsibilities as a Supervisor" and inquiring whether he could "get a head start on some training," and Coffman informed Dunn that he had signed Dunn up for "all the supervisor training they offer Tooling U." Dkt. 37-13.

About a month later, Dunn noted in a diary of events he kept at work that an "Asian guy Loc" told him that "they . . . were not going to make [Dunn] a full time supervisor and that they were using [Dunn]." Dkt. 37-15. Loc allegedly told Dunn that the night supervisor had said there was "no way in the hell they will make that boy supervisor." *Id.* On May 17, 2017, Dunn noted that he asked Coffman about this issue and Coffman told him that he would "check in to it." *Id.* On May 26, 2017, Dunn wrote in the same diary that Coffman called him into his office and told him that the

---

[3] Coffman's title was "facilities manager," and he was the supervisor of the maintenance department. Dkt. 31, Ex. A ¶ 15. According to NCC's human resources manager, Jennifer Waggoner, Coffman "could interview candidates and make recommendations for hire and promotion, but his manager, Lee Currier, Strategic Projects Manager, had the ultimate decision making power to hire or promote." *Id.*

company had just hired a "white kid straight out of college with no [training] and made him head of a department" and that the managers above Coffman had told him to "get rid of [Dunn's] black ass" and that it was "racial." *Id.* Despite this discussion, on June 6, 2014, Dunn wrote that Coffman told him he needed to take classes on being a supervisor and that Coffman would order some books for Dunn. Dkt. 37, Ex. 16.

On June 10, 2014, Dunn was locked in a machine while he was performing maintenance on it. Dkt. 31, Ex. A ¶ 27. Dunn contends the door accidentally closed and locked. Dkt. 31, Ex. A-12 (Dunn's statement regarding the accident). He had inserted a rag to keep the door from locking, but the rag fell out. *Id.* Dunn said that he yelled for another employee to open the door, and the other employee was able to let him out. *Id.* NCC considered this a "Near Miss," and it requires employees to report near misses on a form. *Id.*; Dkt. 36, Exs. A-16, A-17. Dunn told Coffman about the incident but did not complete the form. Dkt. 36 at 23; Dkt. 31, Ex. A-13 (Coffman's account of the near miss).

On June 13, 2014, Dunn sent two emails to NCC's corporate office. Dkt. 31, Ex. A ¶ 29. The first provides a phone number and states that he "just want[s] to make a living for [his] family, and if they are intimidated by [him] ok just transfer [him] to another facilit[y]." Dkt. 31, Ex. A-20. Attached to that email is a list entitled "Update" that contains a diary of events from May 23, 2014 through June, 13, 2014. *Id.* His note on June 9, 2014, after discussing the promotion of a white employee, states: "It is for sure, that if you have knowledge and you are of color; your chances of being promoted are slim to none." Dunn's entry for June 6, 2014, discusses how Coffman wanted him to take classes on being a supervisor and how Coffman did not understand why there was such a delay. *Id.* He then stated, "maybe my skin is my sin." *Id.*

The other email notes that he wanted to let somebody outside of the facility know what was happening. Dkt. 31, Ex. A-21. Dunn noted that a transfer may be helpful as "no person should feel unwelcomed in his/her work place." *Id.* The corporate office forwarded both emails to Waggoner, and Waggoner met with Dunn the following week to discuss. Dkt. 31, Exs. A, A-20, A-21. Waggoner reports that she, NCC's president Dane Tipton, and Dunn had a seventy-five minute meeting during which Dunn "spoke in generalities and did not answer direct questions." Dkt. 31, Ex. A ¶ 32. She asserts that Dunn did not provide any specific information to investigate and "asked to be left alone." *Id.*

On June 18, 2014, Dunn and Coffman had a discussion about Dunn failing to clock out. Dkt. 31, Ex. A-24. Coffman forwarded the email to Waggoner. Dkt. 31, Ex. A ¶ 34. Dunn received a written warning for this incident which indicates he was violating company policies. Dkt. 31, Exs. A, A-25. Dunn's "employee statement" on this warning is "complete retaliation." Dkt. 31, Ex. A-25.

On June 19, 2014, Dunn sent another email to the corporate office. Dkt. 31, Ex. A-28. He informed them that the problems "just will not stop" and he had been "forced to seek legal representation." *Id.* He notes that since his initial complaints he had been written up and harassed and other employees had been asked to write statements. *Id.* He reiterated that all he "asked was for it to stop." *Id.*

On June 20, 2014, Dunn's employment was terminated. Dkt. 37, Ex. 17. Waggoner, Tipton, and Hillary LaManna (the Human Resources manager at corporate who had received Dunn's complaints)) made the decision. Dkt. 31, Ex. A ¶¶ 37–38. The reason for separation, according to the separation notice, was that Dunn "refused to cooperate in 3 separate investigations and [was] insubordinate to [management]." *Id.* The separation notice has a final employee evaluation section,

and the following categories are marked "unsatisfactory": reliability, adherence to policy, interpersonal relations, and judgment. *Id.* Dunn received "satisfactory" ratings with regard to quality, productivity, job knowledge, attendance, independence, creativity, and initiative. *Id.* There is a "yes/no" check box after the question "Would you rehire?," and "No" is checked. *Id.*

Dunn filed a charge with the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue notice on March 22, 2016. Dkt. 1 & Ex. A. Dunn timely filed his complaint in this court on June 17, 2016. Dkt. 1. He asserts the following claims: (1) race discrimination in violation of Title VII and 42 U.S.C. § 1981; (2) hostile work environment in violation of Title VII and 42 U.S.C. § 1981; (3) racial harassment; (4) disparate treatment in violation of Title VII; (5) vicarious employer liability for harassment by supervisors in violation of Title VII and § 1981; (6) retaliation in violation of Title VII and § 1981; (7) vicarious liability; (8) negligence; and (9) intentional infliction of emotional distress. *Id.* Dunn requests compensatory and punitive damages. *Id.*

On August 31, 2016, NCC filed a motion to partially dismiss. Dkt. 5. On October 24, 2016, the court granted the motion and dismissed Dunn's state-law negligence, intentional infliction of emotional distress, and vicarious liability claims. Dkt. 15.

On June 30, 2017, NCC filed a motion for summary judgment, seeking summary judgment in its favor on Dunn's remaining claims. Dkt. 31. NCC argues that Dunn cannot make out a prima facie case of race discrimination because he fails to identify a valid comparator and because there was not even a promotion available. *Id.* NCC asserts that Dunn's harassment claims fail because he cannot establish that the alleged racial comments were severe or pervasive enough to affect a term or condition of employment. *Id.* It additionally notes that Dunn did not take advantage of NCC's "remedial opportunities," so Dunn cannot establish that NCC knew or should have known about the

5

alleged harassment. *Id.* Moreover, NCC claims that is had a legitimate nondiscriminatory reasons for terminating Dunn's employment. *Id.*

On August 7, 2017, Dunn filed a response to the motion for summary judgment.[4] Dkt. 36. Dunn contends that he has direct evidence that he was denied a promotion because of his race and that he therefore does not need to meet the prima facie burden that plaintiffs proving discrimination through circumstantial evidence must meet. *Id.* With regard to unequal pay, Dunn argues that Coffman (Dunn's supervisor) is an appropriate comparator and that Coffman made more than Dunn. *Id.* Dunn contends that he can prove disparate treatment by showing that other similarly situated employees outside of his protected class were treated more favorably under nearly identical circumstances because Dunn was disciplined "for the smallest of perceived infractions"—reporting an incident orally instead of in writing—and other workers were not disciplined for more serious infractions. *Id.* With regard to hostile environment, Dunn contends he was described using a racial slur multiple times and called a slave, a monkey, and a mayate (a Spanish word that allegedly translates into a racial slur), and that people used the term "black ass" with regard to Dunn more than once. *Id.* Dunn asserts that racial epithets and comments "were constant, almost daily as to be considered both severe and pervasive." *Id.* Dunn contends that he reported the harassment pursuant to NCC's reporting procedure because he told Coffman "almost daily," he sent an unsigned email to corporate, and he reported the use of the "mayate" term to Human Resources. *Id.* Dunn additionally argues he was terminated after these reports in retaliation for engaging in protected activity. *Id.*

---

[4] The court extended the time to file the response at Dunn's request. Dkt. 33.

NCC argues in reply that Dunn does not provide any direct evidence that he was discriminated against for failure to promote and cannot establish pretext. Dkt. 44. NCC argues that Dunn does not identify any comparators who were treated differently under nearly identical circumstances. *Id.* With regard to pay, NCC asserts that Dunn may not say that Coffman is his comparator, thus creating a new comparator, at this stage to attempt to create a fact issue. *Id.* Moreover, NCC contends that even if Dunn got past the prima facie case, Dunn has no evidence indicating that NCC's legitimate reason for terminating Dunn's employment is pretext. *Id.* NCC argues that Dunn cannot maintain a claim for disparate impact and fails to establish a genuine issue of material fact with regard to harassment because his evidence is unsupported and does not establish a prima facie case. *Id.* Finally, NCC argues that Dunn's retaliation claim fails for the same reasons his discrimination claim fails—because he has no evidence of pretext. *Id.*

Dunn also asserts various objections to NCC's summary judgment evidence. Dkt. 36. The court will first rule on the evidentiary objections and then determine whether NCC is entitled to summary judgment on each of Dunn's claims.

## II. EVIDENTIARY OBJECTIONS

Dunn moves to strike the following evidence attached to NCC's motion for summary judgment: (1) affidavit of Jennifer Waggoner (Ex. A), which Dunn contends was not made under penalty of perjury or with personal knowledge; (2) a job description that post-dates Dunn's employment date (Ex. A-4); (3) a payroll record (Ex. A-5), which Dunn contends should not be admitted if Waggoner's affidavit is not made on personal knowledge; (4) a record of a co-worker's complaint (Ex. A-9) because the translation of the complaint did not indicate it was a true and correct translation and it is therefore hearsay; (5) various reports and emails relating incidents at work (Exs. A-11 through A-15), which Dunn contends were prepared in anticipation of filing the motion

for summary judgment and are thus untrustworthy; (6) more emails and one of Dunn's training records (Exs. A-18 through A-24), which Dunn contends have not been authenticated; (7) Dunn's separation notice (Ex. A-29), which Dunn contends lacks authenticity under the doctrine of optional completeness; (8) a description of the NCC position of assistant coupling supervisor (Ex. A-30), which Dunn contends cannot be authenticated and was prepared solely for the motion; and (9) a transcript (Ex. G-1) of a tape that contains a disclaimer because it cannot be considered an accurate reproduction of the conversation recorded.

NCC asserts that the Waggoner affidavit (Ex. A) is valid evidence because it is a sworn affidavit that was notarized and thus does not need to state it was made "under penalty of perjury." Dkt. 44. NCC argues that Waggoner appropriately authenticated all of the documents attached to her affidavit as business records and that she may authenticate the documents as business records as a "qualified person" under Federal Rule of Evidence 902(11). *Id.* NCC additionally provides specific reasons all of Dunn's other objections should be overruled. *Id.*

**A. Waggoner Affidavit**

NCC's first exhibit is the affidavit of Jennifer Waggoner, who is the Human Resources Manager of NCC and has working for NCC or its sister company since May 2011. Dkt. 31, Ex. A. The affidavit begins with the following sentence: "Before me, the undersigned authority, on this day appeared Jennifer Waggoner, a person known to me, who upon her oath deposed and stated as follows . . . ." *Id.* The affidavit is signed and sealed by a notary public. *Id.*

Dunn asserts that an "affidavit must be sworn and made under penalty of perjury." Dkt. 36 at 8 (citing *Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985)). Dunn argues that there is no statement in Waggoner's affidavit that it was "made under penalty of perjury," so the affidavit should

be stricken. *Id.* NCC contends that an affidavit does not need to state that is it made under penalty of perjury if it is notarized. Dkt. 44.

In *Pfeil*, the Seventh Circuit, in considering whether to reverse a district court that refused to consider an affidavit missing the notary public's seal, stated that "[a]ffidavits are admissible in summary judgment proceedings if they are made under penalties of perjury; only unsworn documents purporting to be affidavits may be rejected." 757 F.2d at 859 (citing 28 U.S.C. § 1746). It went on to note that the "'absence of the formal requirements of a jurat in . . . sworn affidavits [does] not invalidate the statements or render them inadmissible if they were actually sworn to before an officer authorized to administer an oath.'" *Id.* (quoting *Peters v. United States*, 408 F.2d 719, 722 (Ct. Cl. 1969)). The court found that the affidavits in that case were sworn before a notary public and that "so long as the documents comply with 28 U.S.C. § 1746, and in the interests of justice, a district court should not be unnecessarily hyper-technical and overly harsh on a party who unintentionally fails to make certain that all technical, non-substantive requirements of execution are satisfied." *Id.* Under 28 U.S.C. § 1746,

> Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
>
> (1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".

9

> (2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

28 U.S.C. § 1746. This statute obviously applies when the statement is *not* notarized. The statement here is notarized, it just does not say "under penalty of perjury."

A signed statement that is notarized but does not state it is "true and correct" or "under penalty of perjury" does not qualify as a "sworn statement" under Fifth Circuit law. *See Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1306 (5th Cir. 1988) ("Kline never declared her statement to be true and correct; therefore, her affidavit must be disregarded as summary judgment proof."). In *Nissho-Iwai*, the Fifth Circuit noted that such a statement would allow "the affiant to circumvent the penalties of perjury in signing onto intentional falsehoods." *Id.*

Here, while the affidavit does not state "penalty of perjury," the court finds that the fact that it is notarized and the affiant declares it is "true and correct" is enough to subject her to the penalties of perjury. Thus, the affidavit is sufficient to qualify as a sworn statement and need not abide by the letter of 28 U.S.C. § 1746. Dunn's objection to the affidavit is **OVERRULED.**

## B.     Exhibit A-4

Exhibit A-4 is NCC's position description for a service engineer. Dkt. 31-2, Ex. A-4. It is dated August 19, 2013. *Id.* It was signed by a supervisor and employee (employee name illegible; supervisor first name is John) on January 6, 2014. *Id.* Dunn contends that since the signature date is *after* December 11, 2013—the date his employment commenced—its authenticity is questionable. Dkt. 36. NCC argues that the fact that the date the document was signed has no bearing on its authenticity and points out that Dunn did not dispute the document's authenticity during his deposition. Dkt. 44.

The court agrees with NCC. Dunn admitted during his deposition that he had read and signed this job description. Dkt. 44-2 at 70–71. He agreed that he remembered "filling it out and completing it with Mr. Coffman." *Id.* at 71. The date it was signed could possibly have some bearing on whether Dunn knew his job description between the date he was hired and the date the document was signed, but it does not make the document any less authentic. Dunn's objection to this exhibit is **OVERRULED**.

## C.    Exhibit A-5

Exhibit A-5 is a copy of Dunn's payroll records from NCC. Dkt. 31-2, Ex. A-5. It was attached to Waggoner's affidavit, and Waggoner contends the records are "true and correct copies of payroll registers from Mr. Dunn." Dkt. 31-2, Ex. A. Dunn objects to this exhibit because the document was issued by Paychex of New York LLC and thus cannot be within Waggoner's personal knowledge. Dkt. 36. NCC argues that the payroll registers are admissible because Waggoner is the custodian of records, and she testified that the records were kept in the ordinary course of business. Dkt. 44. The court agrees with NCC. The payroll registers are admissible as business records under Federal Rule of Evidence 803(6)(B). Dunn's objection to Exhibit A-5 is **OVERRULED.**

## D.    Exhibit A-9

Exhibit A-9 is a copy of a handwritten statement by Jose Cortes, in Spanish, that is dated May 20, 2014. Dkt. 31-3, Ex. A-9. The exhibit includes a typed translation by Jorge Munoz. *Id.* Dunn objects to the translation as hearsay because it is being used for the truth of the matter asserted and because Munoz did not state under penalty of perjury that the translation was true and correct. Dkt. 36. Dunn also contends that the handwritten portion contains a word that is not even a word

in Spanish–"promeve."[5]  *Id.*  Additionally, Dunn argues that he did not have a chance to cross examine the translator.  *Id.*  NCC argues that it is not using the statement for the truth of the matter but merely to demonstrate that it received complaints about Dunn.  Dkt. 44.  As far as cross-examining the translator, NCC points out that Dunn was free to depose the translator during discovery.  *Id.*

The court agrees with NCC that the original statement is not hearsay because NCC is not using it to show the truth of Cortes's allegations but to show that Cortes had a complaint about Dunn.  *See* Fed. R. Evid. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted.").  The translation must be considered more closely.  In general a translator is a "mere conduit" and "does not create an additional level of hearsay."  *United States v. Cordero*, 18 F.3d 1248, 1253 (5th Cir. 1994).  However, in unusual circumstances, such as when the accuracy of the confession is legitimately questioned, courts must scrutinize the translation more closely.  Courts in the Fifth Circuit consider the following factors when determining "whether to treat the translator as a mere language conduit": "(1) which party supplied the interpreter; (2) whether the interpreter had any motive to mislead or distort; (3) the interpreter's qualifications and language skill; and (4) whether actions taken subsequent to the conversation were consistent with the statements as translated."  *United States v. Martinez-Gaytan*, 213 F.3d 890, 892 (5th Cir. 2000).  Here, NCC supplied the interpreter, and the court has no information regarding the interpretation.  *See* Dkt. 31, Ex. A ¶ 25 (noting that Exhibit A-9 is a copy of a complaint and "the translation from Spanish to English").  NCC as the proponent of the hearsay has the burden of

---

[5]  The court notes that the Spanish word with which Dunn takes issue in handwritten print and is likely the word "promere," which is a valid Spanish word, not the word "promeve."  The meaning of this word, however, and whether it is a valid Spanish word, is of no consequence to the court's analysis.

showing that a hearsay exception or exemption applies, and NCC has not met that burden. *See Bldg. Specialties, Inc. v. Liberty Mut. Fire Ins. Co.*, 712 F. Supp. 2d 628, 646 (S.D. Tex. 2010) (Rosenthal, J.). Accordingly, Dunn's objection to Exhibit A-9 is **SUSTAINED**.

**E.    Exhibits A-11 to A-15**

Exhibits A-11 through A-15 are statements from various individuals relating to Dunn being locked in a machine while performing maintenance, which NCC characterizes as a "near miss," or Dunn's interactions with other employees. Dkt. 31, Exs. A, A-11–A-15. Exhibit A-11 is an email from Coffman to Waggoner dated May 21, 2014, in which Coffman discusses how he addressed an issue relating to an employee in the maintenance department–Mr. Cortes. Dkt. 31, Ex. A-11. Exhibit A-12 is a statement by Dunn about the "accident"—being locked in the machine; it is not dated. Dkt. 31, Ex. A-12. Exhibit A-13 is a statement by Coffman about what Dunn reported regarding being locked in the machine; it is dated June 17, 2014. Dkt. 31, Ex. A-13. Exhibit A-14 are notes by James Vau, who was investigating the near miss; the notes were prepared from June 17 through June 20, 2014. Dkt. 31, Ex. A-14. Exhibit A-15 purports to be a record of an interview of Dunn that occurred on June 18, 2014 and appears to have been signed by Dunn on June 20, 2014. Dkt. 31, Ex. A-15.

Dunn argues that these statements must all be stricken from the record because they lack trustworthiness and were prepared in anticipation of filing the motion for summary judgment. Dkt. 36. He also contends that Exhibit A-15, which appears to contain Dunn's signature, "was not signed by Dunn but by someone else." *Id.* NCC first notes that it is unclear how the documents could have been prepared in anticipation of litigation when they were prepared in 2014. Dkt. 44. It then points out that Exhibit A-12, the statement by Dunn that is not signed, is an excerpt from Dunn's own notes, the entirety of which are dated and attached as Exhibit E to the motion. *Id.* With

regard to the allegation of forgery, NCC states that it "takes seriously Dunn's allegation of forgery and objects to Dunn's baseless assertion that his signature was forged." *Id.*

The court first addresses Dunn's objection that these exhibits are not trustworthy because they were prepared in anticipation to filing a motion for summary judgment. The documents were prepared several years ago and almost immediately after a complaint and an incident in the workplace. It was reasonable for Dunn's employer to investigate the incident and for Coffman to forward his resolution of the complaint to human resources. There is no reason to believe that the documents are untrustworthy because NCC potentially anticipated that it would be filing a motion for summary judgment in future litigation several years ago. This objection is **OVERRULED**.

The court next addresses the forgery allegation. Dunn asserts that he need not introduce affirmative evidence of untrustworthiness, but only needs to raise the issue, citing the notes to Federal Rule of Evidence 803. Dkt. 36. Dunn does not provide an affidavit to support the contention in his response that the notes from his interview on June 18, 2014 were not signed by him. *See id.* NCC does not provide any citation or defense to the allegation; it merely notes that Dunn has presented no evidence of forgery and that it takes the allegation seriously and "objects to Dunn's baseless assertion." Dkt. 44 at 14.

Federal Rule of Evidence 803 is a list of exceptions to the rule against hearsay. Fed. R. Evid. 803. NCC presumably offers the document at issue under Rule 803(6), which is the business records exception. The notes to the rule indicate that this exception exists because of the "element of unusual reliability of business records" due to "systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation." Fed. R. Evid. 803, note to para. (6). The 2014 notes, which Dunn references, state that "if the proponent has established the

stated requirements of the exception—regular business with regularly kept record, source with personal knowledge, record made timely, and foundation testimony or certification—then the burden is on the opponent to show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." *Id.* In meeting the burden, the opponent "is not necessarily required to introduce affirmative evidence of untrustworthiness," and the "determination of untrustworthiness necessarily depends on the circumstances." *Id.*

Here, Dunn appears to assert that his burden is simply to assert that the document is forged or that the documents are untrustworthy and that the court must then completely disregard the documents. However, as the notes to the Rules of Evidence state, the trustworthiness or lack thereof is dependent on the circumstances. The court finds that Dunn has not satisfied his burden by merely stating documents are prepared in anticipation of litigation or conclusorily alleging that he did not sign a document. While certainly the court will not treat Exhibit A-15 as a statement that was signed by Dunn since he disputes signing it, Dunn has given the court no reason to question the substance of the document, which seems to describe what happened on June 10 from Dunn's perspective. Dkt. 31-3, Ex. A-15. Whether Dunn signed the document or not, the business records affidavit states it is a "true and correct copy of Mr. Dunn's interview regarding the near miss incident." Dkt. 31, Ex. A ¶ 27. Dunn's objection to this exhibit is **OVERRULED**.[6]

## F.    Exhibits A-18 to A-24

Dunn objects to exhibits A-18 through A-24 because he contends these exhibits are electronically stored information that has not been authenticated. Dkt. 36. He contends that Waggoner's affidavit does not adequately indicate that the records reflect the electronically stored

---

[6] That being said, this allegedly forged statement does not provide any additional substance to other evidence in the record about the near miss. Thus, the court need not rely on Exhibit A-15 when ruling on the motion for summary judgment.

information or that the method of generation is reliable. *Id.* (citing *Lorraine v. Markel Am. Ins.*, 241 F.R.D. 534, 542-43 (D. Md. 2007)). NCC points out that Exhibit A-18 is not electronically stored information and all of the other exhibits are emails that provide circumstantial evidence that the email was written by the person identified by the sender's email address. Dkt. 44. It also notes that Exhibits A-19, A-20, A-21, A-22, and A-24 all contain Waggoner as either a recipient or sender, so her affidavit authenticates them not only as a custodian of record but as a recipient or author of the email. *Id.* As to Exhibit A-23, NCC notes that (a) Waggoner authenticates this email as custodian of records; and (b) regardless, Dunn himself cites to the email in his response to the motion for summary judgment. *Id.* (citing Dkt. 36 at 7).

First, with regard to exhibit A-18, it is not electronically stored information, so Dunn's objection based on it being electronically stored information that was not properly authenticated is **OVERRULED**. Second, with regard to all of the emails which Waggoner sent or received, she states in her affidavit that they are true and correct copies. Under Federal Rule of Evidence 901(a), in order to authenticate an item of evidence, "the proponent must produce the evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Since Waggoner sent or received these emails, she is an appropriate person to testify as to their authenticity. The non-binding case cited by Dunn, *Lorraine v. Markel*, supports this conclusion. *See Lorraine*, 241 F.R.D. at 542. In *Lorraine*, the United States District Court for the District of Maryland noted that a "party seeking to admit an exhibit need only make a prima facie showing that it is what he or she claims it to be" under Rule 901 and that "[c]ourts considering the admissibility of electronic evidence frequently have acknowledged that it may be authenticated by a custodian or other qualified witness with personal knowledge." *Id.* Dunn's objections that Exhibits A-19, A-20, A-21, A-22, and A-24 are not properly authenticated are therefore **OVERRULED**. Third, with

regard to Exhibit A-23, the court finds the fact that Dunn also relies on the evidence is dispositive. This objection is **OVERRULED**.

**G.     Exhibit A-29**

Exhibit A-29 is Dunn's separation notice.  Dkt. 31, Ex. A-29.  Dunn contends that the document lacks authenticity and should also be stricken under the doctrine of optional completeness. Dkt. 36.  Dunn asserts that NCC "tried unsuccessfully to white out from the section titled 'FINAL EMPLOYEE EVALUATION' evaluations that were favorable to Dunn." *Id.*  He contends that NCC changed the "S" for Satisfactory to a "U" for Unsatisfactory and then placed an X before the U in the sections entitled "Interpersonal Relations" and "Judgment." *Id.*  As far as completeness, Dunn points out that the document states to "see packet" for "dates of past warnings," but no packet is attached to the exhibit. *Id.*

NCC argues that Dunn offers no proof of his claim, and it "strongly objects to any allegation that it attempted to alter a document."  Dkt. 44.  It then points out that the evaluation section was completed in red ink and that it attached a color copy to its motion. *Id.*  NCC hypothesizes that perhaps Dunn's printer printed the red ink portion lighter, resulting in a copy that looked whited out. *Id.*

The copy of the separation notice that is in the docket is in color. *See* Dkt. 31-4, Ex. A-29. The only slot that looks like it could have been whited out slightly is the "S" under "Creativity." *See id.*  There are Xs and Us next to "Interpersonal Relations" and "Judgment," and there is clearly an "X" next to the question "Would you rehire?" *Id.*  However, whether it has actually been altered is a question of fact.  That being said, the only slots that Dunn alleges have been altered are "Interpersonal Relations" and "Judgment."  The court need not consider these two categories as "Reliability" and "Adherence to Policy" are clearly marked "U" for "Unsatisfactory," and the "No"

spot is marked with an X after the question "Would you rehire?" *See id.* Thus, substantively the notice backs up the reasons NCC advances for why it terminated Dunn's employment even if the "Interpersonal Relations" and "Judgment" slots were altered. The objection due to lack of authenticity is **OVERRULED AS MOOT**.

As to the objection that the document is incomplete, the remedy for this objection is to complete the document, not strike it. Under Federal Rule of Evidence 106,

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.

Fed. R. Evid. 106. Generally, under this rule, the court would simply require NCC to submit the packet to which the document refers to ensure the information in considered in its complete form. However, NCC did not respond to Dunn's objection under the doctrine of optional completeness, and it did not submit the packet to complete the exhibit. The court cannot determine whether it ought to in fairness consider the packet without having the opportunity to review the packet.

However, Dunn himself relies on this allegedly incomplete exhibit in his response to the motion for summary judgment. Dkt. 36 at 7; *see* Dkt. 36, Ex. 17 (the separation notice). Since Dunn relies on and attaches the exhibit himself as summary judgment evidence, his motion to strike the exhibit because it does not include the packet is **OVERRULED**.

## H.    Exhibit A-30

Exhibit A-30 is NCC's job description for an "Assistant Coupling Supervisor." Dkt. 31, Ex. A-30. Dunn contends that this document cannot be authenticated and was prepared solely for the purpose of summary judgment. Dkt. 36. He also argues that it is undated, the print is new, and the font on pages three to four is different than the font on pages one and two. *Id.* He argues that

the "authenticity of the document having been questioned, the Court must strike the document from the record." *Id.*

NCC argues that none of these allegations support Dunn's assertion that this document was prepared for the motion for summary judgment. Dkt. 44. It additionally contends that the font does not change within the document and that perhaps Dunn had a problem with his printer. *Id.*

Like NCC, the court does not perceive a change in font within the document. *See* Dkt. 31, Ex. A-30. Nothing other than Dunn's conclusory assertion that the document was prepared in anticipation of the motion for summary judgment supports his suspicion that it was so prepared. Waggoner, who is a human resources manager with NCC, stated in the context of discussing the person who was promoted to Assistant Coupling Test Supervisor during Dunn's tenure that "Exhibit A-30 is a true and correct copy of the job description for the Assistant Coupling Test Supervisor position." Dkt. 31, Ex. A ¶ 40. This is sufficient to authenticate the job description. Dunn's objection is **OVERRULED**.

## I.     Exhibit G-1

Exhibit G-1 is attached to the affidavit of Katherine G. Cisneros, who is an attorney for the firm representing NCC. Dkt. 31, Ex. G. It is a transcript of a recorded conversation between Dunn, Tipton, and Waggoner. *Id.* The recorded conversation was provided to NCC by Dunn during discovery, and NCC's counsel had the recording transcribed. *Id.* The transcript notes that it is "based upon the recording as heard on the particular electronic equipment provided, the speaking speed, and the content of the conversation as understood by the reporter." Dkt. 31, Ex. G-1. Dunn takes issue with this disclaimer, asserting that it does not indicate it is an accurate reproduction of the recorded conversation. Dkt. 36.

Dunn cites *United States v. Rochan*, 563 F.2d 1246, 1251 (5th Cir. 1977), to support his assertion that the transcript must state that it is an accurate representation.  In *Rochan*, a criminal case that proceeded to trial, the government had supplied the jury with transcripts of tape-recorded conversations between alleged co-conspirators.  563 F.2d at 1251.  The tapes had been transcribed by a government stenographer, and the judge advised the jury that the transcripts "were merely the government's version of what had happened." *Id.*  A person who participated in the conversations on the tapes testified that the transcripts were accurate, but the stenographer did not testify. *Id.*  On appeal, the convicted defendants argued that the transcripts were not properly authenticated. *Id.*  The court held that "there must be some evidence that the transcripts are accurate[,] that the words are accurately reproduced[,] and the voices [are] accurately identified." *Id.*  The court was discussing these transcripts as being supplemental to the tape, which the jury had heard. *Id.*  It held that the foundation may be laid by having the person who prepared the transcripts testify but that this "testimony is unnecessary if someone else who either heard the tape or participated in the conversation assumes the task." *Id.* at 1252.

Here, the court has not been provided with the actual recordings, so *Rochan*, which deals with supplemental transcripts, is not on point.  In the current case, the court finds it notable that Dunn takes issue with whether the disclaimer is proper, yet he does not point out any alleged discrepancies between the transcripts and the tape or provide the court with a copy of the tape.  Under Federal Rule of Civil Procedure 56(c)(2), a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  Here, since the tapes themselves will be available to play for the jury and Dunn does not object to any alleged discrepancies in the transcription, he appears to be placing form over

substance. There is no indication that the information contained in the transcript will not be admissible in evidence at trial. Accordingly, Dunn's objection is **OVERRULED**.

### III. MOTION FOR SUMMARY JUDGMENT

NCC argues that it is entitled to summary judgment on all of Dunn's claims. Dkt. 31. It asserts that Dunn's race discrimination claims fail because (1) Dunn cannot establish that he was denied a promotion to supervisor because he has no direct evidence and fails to meet three out of four elements of the prima facie case; (2) Dunn cannot establish that he was paid less that a member of a different race with substantially the same responsibility because he has not identified any similarly situated individuals who were treated more favorably; (3) Dunn cannot establish that he was denied a supervisory title and pay when he was doing supervisory work because his duties were not supervisory-type duties; and (4) Dunn cannot establish that he was disciplined when white employees were not because he has not identified any white employees who were treated differently under similar circumstances. *Id.* NCC argues that judgment should be entered in its favor on Dunn's disparate impact claim, to the extent Dunn asserts disparate impact, because Dunn did not specifically plead this claim and did not exhaust his administrative remedies with regard to disparate impact. *Id.* NCC asserts that it is entitled to summary judgment on Dunn's harassment claims because (1) Dunn cannot show he suffered harassment that affected a term, condition, or privilege of employment; and (2) Dunn cannot show that NCC knew or should have known about the alleged harassment by his coworkers. *Id.* Finally, NCC contends that summary judgment should be entered in its favor on Dunn's retaliation claims because (1) Dunn cannot establish that he was subject to an adverse employment action; (2) he cannot establish a causal connection between his complaint and the alleged adverse action; and (3) he cannot establish that NCC's reason for terminating his employment was pretext. *Id.*

Dunn argues that he has direct evidence that he was denied promotion on account of his race and thus does not need to establish a prima facie case. Dkt. 36. He asserts that, regardless, he can meet the prima facie burden because a similarly situated white employee was promoted and Dunn was not. *Id.* As far as his equal pay claim, Dunn contends that caselaw relied upon by NCC is non-precedential and that, under precedential caselaw, he can point to a valid comparator who was paid more than him. *Id.* Dunn argues that he is entitled to present his equal pay claims to the jury because he was not paid as a manager even though he was doing the work. *Id.* He contends that there is an issue of material fact with regard to his disparate discipline claims. *Id.* With regard to disparate impact, Dunn contends that the EEOC charge is nondispositive because he "need not detail all the racial animus of his employer on the EEOC Intake Form or his Charge of Discrimination." *Id.* Dunn also argues that his hostile work environment/harassment claim should survive summary judgment because he was clearly subjected to unwelcome harassment, the racial remarks were not stray remarks, and the harassment, which included an abundance of racial epithets and racially offensive graffiti, was pervasive. *Id.* He contends that the harassment affected a term or condition of his employment because it resulted in the denial of his promotion. *Id.* He argues that he reported the harassment to Coffman almost every day and also sent an unsigned email to corporate about the harassment. *Id.* Finally, Dunn argues that his retaliation claim should survive because his employment was terminated after he contacted corporate to report unlawful discrimination. *Id.*

## A.   Legal Standard

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The

moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

**B.      Racial Discrimination**

Dunn's first cause of action is for race discrimination under Title VII and 42 U.S.C. § 1981. Dkt. 1 at 6. He contends that NCC discriminated him based on race when it (1) did not promote him; (2) required him to perform supervisory tasks without a promotion; (3) disciplined him differently than it disciplined employees outside of his protected class; and (4) did not pay him the same as it paid employees outside of his protected class. The court will first set forth the legal standard for race discrimination claims, and then it will determine whether summary judgment is appropriate on Dunn's discrimination claims.

**1.      Legal Standard: Discrimination**

Courts in the Fifth Circuit "evaluate claims of race discrimination under § 1981 using the same analysis as those under Title VII." *Bright v. GB Bioscience Inc.*, 305 F. App'x 197, 201 n.3 (5th Cir. 2008) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363 (1989), *superceded by statute on other grounds as stated in CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 449, 128 S. Ct. 1951 (2008)). Plaintiffs may prove discrimination using either direct or circumstantial evidence. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 345 (5th Cir. 2007). "Direct evidence is evidence which, if believed, proves the fact without inference or presumption." *Jones v. Robinson Prop. Grp. L.P.*, 427 F.3d 987, 992 (5th Cir. 2005). In employment cases, if "a

person or persons with decision making authority evinces racial animus that may constitute direct evidence of discrimination." *Id.* at 993. Comments by an employer are only "probative of an employer's discriminatory intent" if the comments are "direct and unambiguous, allowing a reasonable jury to conclude without any inferences or presumptions that [the protected characteristic] was an impermissible factor in the decision to terminate the employee." *EEOC v. Tex. Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). In the Fifth Circuit, the test originally set forth in *Brown v. CSC Logic* is the appropriate test for determining whether the statement is direct evidence of discrimination. *See Laxton v. Gap Inc.*, 333 F.3d 572, 583 n.4 (5th Cir. 2003) (noting that notwithstanding the Supreme Court's abrogation of the *CSC Logic* test when evaluating stray remarks in the context of proving pretext, the Fifth Circuit "continue[s] to apply the *CSC Logic* test when a remark is presented as direct evidence of discrimination apart from the *McDonnell Douglas* framework"); *see also Brown v. CSC Logic*, 82 F.3d 651 (5th Cir. 1996), abrogated in part by *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S. Ct. 2097 (2000); Dkt. 36 (relying on the *CSC Logic* elements as set forth in *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 405 (5th Cir. 2001)); Dkt. 44 (relying on the *CSC Logic* elements as set forth in *Reilly v. TXU Corp.*, 271 F. App'x 375, 379 (5th Cir. 2008)). Under this test, the statement must be "1) related [to the protected class of persons]; 2) proximate in time to the terminations; 3) made by an individual with authority over the employment decision at issue; and 4) related to the employment decision at issue." *Auguster*, 249 F.3d at 405 (citations and quotations omitted); *see CSC Logic*, 82 F.3d at 655.

Race discrimination claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* framework. *Turner*, 476 F.3d at 345. In *McDonnell Douglas*, which was a refusal-to-hire case, the U.S. Supreme Court required the plaintiff to first present a prima facie case by showing "(I) that he belongs to a racial minority; (ii) that he applied and was qualified for a job

for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualification." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973). A failure-to-promote prima facie case is similar. The plaintiff must show that "(1) he was not promoted, (2) he was qualified for the position he sought, (3) he fell within the protected class at the time of the failure to promote, and (4) the defendant either gave the promotion to someone outside of that protected class or otherwise failed to promote the plaintiff because of his race." *Autry v. Fort Bend Indep. Sch. Dist.*, 704 F.3d 344, 346–47 (5th Cir. 2013). If the plaintiff successfully establishes a prima facie case, the burden or production shifts to the employer to "rebut a presumption of discrimination by articulating a legitimate, nondiscriminatory reason for adverse employment action." *Turner*, 776 F.3d at 345. If the employer meets its burden, then the plaintiff must "present substantial evidence that the employer's reason was pretext for discrimination."[7] *Id.* "If the plaintiff can show that the proffered explanation is merely pretextual, that showing, when coupled with the prima facie case, will usually be sufficient to survive summary judgment." *Id.* However, a "Title VII plaintiff at all times bears the 'ultimate burden of persuasion.'" *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742 (1993).

### 2. Direct or Circumstantial Evidence

NCC contends that Dunn has no direct evidence of discrimination and must prove his case

---

[7] Courts in the Fifth Circuit often apply a modified *McDonnell Douglas* approach, which requires, when an employer offers a legitimate nondiscriminatory reason for the adverse employment action, a determination of whether the plaintiff's protected characteristic was also a motivating factor. *Turner*, 476 F.3d at 347. However, in this case, neither party raises mixed motive in their summary judgment briefing. *Cf. id.* ("Turner did not properly raise her mixed-motive argument below until her motion for a new trial. . . . Because a motion for a new trial cannot be used to argue a case under a new legal theory, the district court was correct in finding that Turner's mixed-motive claim was waived.").

using the *McDonnell Douglas* framework.  Dkts. 31, 44.  Dunn argues that he was already being groomed for the supervisor position and that Coffman told him the inaction by upper management was "racial" on more than one occasion.  Dkt. 36 (citing Dkt. 36, Ex. 14 (Dunn Dep.) at 168:14–18; Dkt. 36, Ex. 15 (Dunn's notes)).  Dunn contends that this statement was made the same month that his employment was terminated.  *Id.*  NCC asserts that there is no legal support for Dunn's argument that his being groomed for a supervisory position and not receiving one after six months of employment is sufficient to dispense with his prima facie burden.  Dkt. 44.  It additionally argues that even if the court were to consider Dunn's argument of direct evidence, his claim fails because the comment "it's racial" does not meet the stringent test for direct evidence, which requires that the individual be expressing his or her own racial animus or that the individual objectively believe the statement.  *Id.* (citing *Reilly*, 271 F. App'x at 379).  NCC contends that Dunn has no evidence that Coffman objectively believed the statement.  *Id.*  NCC also points out that Dunn's notes show that Coffman said that the managers who allegedly were making determinations based on race wanted Dunn to take supervisor classes two weeks after the statement that it was racial was made.  *Id.* (citing Dkt. 36 at 7, Dkt. 36, Ex. 14 (Dunn Dep.) at 328:10-329:23, and Dkt. 36, Exs. 15, 16).  NCC argues that this is clear evidence that Coffman could not have objectively believed Dunn would not be promoted because of race because he still wanted Dunn to take classes after the discussion.  *Id.*

In *Reilly*, the plaintiff, John Reilly, did not receive a promotion and was told by his former boss, who was a member of a panel conducting interviews but did not have final decisionmaking power, that he thought the person who had authority to make the final decision "'ha[d] a diversity issue'" and may not have wanted to hire all white males for the open supervisory positions.  271 F. App'x at 378.  A black applicant was selected for the job Reilly wanted.  *Id.*  Reilly sued, and his employer moved for summary judgment.  Reilly attempted to characterize the statement that the

person who had decisionmaking authority had "a diversity issue" as direct evidence of racial animus. *Id.* at 379. The Fifth Circuit noted that the third factor in determining whether a remark is direct evidence of racial discrimination requires the remark to be "made by an individual with authority over the employment decision at issue." *Id. (*citing *Auguster*, 249 F.3d at 405). Reilly argued that the person who made the statement was a member of the interview panel and had *some* decisionmaking authority, but the Fifth Circuit determined that this was insufficient to satisfy the third prong as "the person making the statement must either be expressing his own racial animus, and not someone else's, or have an objective basis for believing it." *Id.* The court noted that if the person speaking had been speaking for himself or if there was evidence that he had an objective reason to believe the decisionmaker actually thought she had a diversity problem, the outcome would be different. *Id.* at 380. The Fifth Circuit viewed the plaintiff's argument as asking that the panel member's "hunch" as to the decisionmaker's motives be viewed as direct evidence of racial animus, which requires inference and thus "is improper in the direct evidence context." *Id.*

While, as Dunn points out, *Reilly* is an unpublished case and thus not precedential, *see* 5th Circuit R. 47.5.4, the court agrees with its reasoning. However, it is not exactly on point. According to NCC's human resources manager, Coffman, similar to the panel member in *Reilly*, had the ability to interview candidates and make recommendations for hire and promotion, but his manager, Lee Currier, had the ultimate decisionmaking power to hire or promote. Dkt. 31, Ex. A ¶ 15. According to Dunn's notes, Coffman told him that Currier and others were "very narrow minded" and, when Dunn asked why, Coffman stated that it was "racial" and asked Dunn "not to repeat it." Dkt. 36, Ex. 15 (May 26, 2014 notes). Dunn wrote in his notes that Coffman "said they just hired a white kid straight out of college with no training and made him head of a department" and that "they told him to get rid of [Dunn's] black ass." *Id.* While Coffman's report that the decisionmaker or

decisionmakers were narrow minded and that it was racial may be similar to the "hunch" that the panel member had in *Reilly* that the decisionmaker "had a diversity issue," in this case, unlike in *Reilly*, Dunn reports that Coffman said a lot more. Dunn's notes state that Coffman gave him an objective reason for saying it was racial—because the people making the promotion decisions had hired a person who was not a member of the protected class who Coffman perceived to be unqualified and because these same people allegedly said to "get rid of [Dunn's] black ass." No level of inference is needed to determine that this statement is racial.

The statement meets all elements of the *CSC Logic* test: it is related to African Americans, it occurred shortly before Dunn's termination, it was made by an individual who had an objective basis for believing the individual in charge of employment decisions had racial animus, and it was related to not promoting Dunn and eventually terminating his employment. NCC's evidence that it offered Dunn training after this statement was allegedly made is certainly evidence that will be of interest to the jury in evaluating the case, but it is not dispositive. Taking the evidence in the light most favorable to Dunn, as the court must at this stage, this offer could have been a made to placate Dunn. The court finds that the statement that the decision not to promote Dunn was "racial" is direct evidence of discrimination.

### 3. Promotion

Dunn contends that he can show by direct evidence that he was denied a promotion because of his protected characteristic. Dkt. 36 at 15. He asserts he was already being groomed for the position and NCC's assertion that it was not soliciting applications for a supervisor position is "hogwash." *Id.* Dunn contends that he completed an application for supervisor as instructed by Coffman and that he finished his "Tool and One Management" training. *Id.* (citing Dkt. 36, Ex. 14 at 49, 81, 182). He argues that NCC did not need to solicit applications because Dunn was in the

28

process of getting the job. *Id.* at 16. He points out that Coffman stated in an email that Dunn was not a supervisor "yet," citing Dkt. 36, Ex. 5, and that Coffman said the lack of action by management was "racial" on two occasions. *Id.* (citing Dkt. 36, Ex. 15; Dkt. 36, Ex. 14 at 168). Dunn additionally argues that NCC's purported reasons for not promoting him are inconsistent and that the court should therefore infer that the preferred reason is pretextual. *Id.* (citing *Gee v. Principi*, 287 F.3d 342, 347–48 (5th Cir. 2002)). Dunn then points out the ways in which he contends that he and another person who was promoted (Jacob Rutt) are appropriate comparators, how NCC's assertion that no other supervisors were needed because Coffman was the supervisor is inconsistent with Coffman's title as a facilities manager; and how Dunn could have been promoted to the position that his alleged comparator was promoted to because promotions do not have to be vertical at NCC. *Id.* at 18.

In reply, NCC argues that Dunn has no legal support for his position that not being promoted after six months of employment is sufficient to establish discrimination for failure to promote. Dkt. 44. It also argues that even if the evidence about the failure to promote being "racial" is considered direct evidence, which it should not be, NCC may establish that it would have made the same decision regardless of any alleged discriminatory animus. *Id.* (citing *Jones*, 427 F.3d at 992). NCC notes that it has provided evidence that it was not seeking a supervisor in Dunn's department during Dunn's employment. *Id.* (citing the Waggoner affidavit).

First, the court agrees that if Dunn's only complaint was that he worked for six months and was not promoted, he would not have a claim for disparate treatment. Moreover, if it were clear that NCC just was not interested in hiring a supervisor for Dunn's department, Dunn would not have a failure-to-promote disparate treatment claim. However, there is enough evidence in the record, taken in the light most favorable to Dunn, for a fact finder to conclude that NCC was considering

promoting Dunn to a supervisory position and that racial animus may have played a role in the decision not to do so. For instance, one could easily infer from Coffman's response to Dunn's email asking if the promotion was forthcoming ("LOL, come see me. Will cover this." (Dkt. 37-8)) that there was an actual position available, and NCC provided training to Dunn relating to becoming a supervisor. There are enough disputes of material facts in the record to make summary judgment inappropriate on the failure to promote claim. NCC's motion for summary judgment on this claim is **DENIED**.

### 3.     Equal Pay

In Dunn's complaint, Dunn alleges that "Caucasian employees . . . received better and superior compensation than the Plaintiff." Dkt. 1 at 10. There is no direct evidence that Dunn was paid less than employees outside his protected class because of race. Thus, Dunn must make out a prima facie case of discrimination for this claim. "To make out a *prima facie* case of discrimination in compensation, a plaintiff must show that he was a member of a protected class and that he was paid less than a non-member for work requiring substantially the same responsibility." *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008). The plaintiff "must show that his circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class." *Id.* at 523.

NCC asserts that Dunn has not identified any specific employees who received more compensation than he. Dkt. 31 at 10. NCC notes that if Dunn is attempting to compare himself to Rutt, Rutt is not nearly identical because he worked in a different department and there is no evidence Rutt had a comparable violation history. *Id.* Moreover, NCC points out that Waggoner's affidavit indicates that Rutt's salary was $48,000 a year and, because Rutt was a supervisor, he was not eligible for overtime. *Id.* (citing Dkt. 31, Ex. A ¶¶ 9, 40). Dunn made $30 per hour and was

eligible for overtime. *Id.* This pay rate resulted in Dunn earning approximately $48,000 during the twenty-seven weeks that he was employed. *Id.*

Dunn argues that the physical requirements for Service Engineer (Dunn's job) and Assistant Coupling Supervisor (Rutt's job) "are similar if not identical." Dkt. 36 at 20. He points out that both jobs require use of the ERP system to perform every day job functions. *Id.* (citing Dkt. 31, Exs. A-4 (position description for Service Engineer), A-30 (position description for Assistant Coupling Supervisor)). As far as pay, Dunn notes that NCC does not state what Dunn's pay is *without* overtime and that "comparing Rutt's salary to Dunn's salary is like comparing apples to oranges." *Id.*

The court agrees that comparing Rutt and Dunn is like comparing apples and oranges. As Dunn notes, both jobs use the ERP System. Rutt's job as an Assistant Coupling Supervisor does require the employee to "[u]tilize ERP System to perform everyday Job Processes." Dkt. 31, Ex. A-30. Dunn's required the employee to "[u]tilize the existing ERP integrated modules to maintain data integrity and material inventory" and "[u]se ERP to complete preventative maintenance documentation as required." Dkt. 31, Ex. A-4. However, that is where the similarities end. The position responsibilities for service engineer include machine maintenance and general facility maintenance. *Id.* Specific duties include diagnosing and repairing machine tooling, reading flowcharts and service manuals, overseeing repairs, maintaining the facilities and building repairs, and maintaining a parts inventory of critical machine parts. *Id.* The assistant coupling supervisor's responsibilities and duties include maintaining the integrity of department inventory, providing technical training and procedures to department personnel, working with the supervisor to meet department goals and metrics, monitoring technicians, reviewing material requirements, and assisting with production activities where needed. Dkt. 31, Ex. A-30. The assistant coupling supervisor was

required to report maintenance issues to the CIS supervisor. *Id.* These jobs, while having some overlap, are clearly *not* nearly identical. Moreover, Dunn was not paid less than Rutt. Waggoner states that Dunn's base rate was $30 per hour. Even without overtime, if Dunn were to work 40 hours per week for 52 weeks a year, he would make $62,400. That is *more* than the $48,000 that Rutt made. Dunn has not shown that Rutt is a valid comparator for Dunn's prima facie case of pay discrimination.

Dunn, however, also contends in his response to NCC's motion for summary judgment that Coffman is his comparator for his equal pay claim. Dkt. 36 t 18–19. Dunn contends that he did the "exact same job as Coffman," and that they were actually co-supervisors, though Coffman had the title of supervisor or facilities manager and Dunn did not. Dkt. 36 at 19–20. NCC asserts that Dunn cannot allege a new comparator in an attempt to create a fact issue and that Dunn provides no support for his contention that he performed work with substantially the same responsibilities as Coffman, who he recognizes was his supervisor. Dkt. 44. NCC argues that the facts Dunn provides to support his claim that he and Coffman were actually co-supervisors are cherry-picked and mischaracterized. *Id.*

The court has reviewed the evidence submitted by Dunn asserting that Coffman is his comparator and finds that while it appears that both Dunn and Coffman had some general supervisory functions, Dunn has not met his burden of showing that he and Coffman were in "nearly identical" circumstances. There is actually very little information in the record about what Coffman's job responsibilities were. Moreover, there is nothing in the record about Coffman's pay other than Dunn's conclusory assertion that the "Defendant cannot rebutt [sic.] the fact that Coffman was paid more than Dunn." Dkt. 36 at 20. And, it is clear that Coffman (and Rutt) both had worked

at NCC substantially longer than Dunn. Dunn has not shown that Coffman is a valid comparator for Dunn's prima facie case of pay discrimination.

Additionally, Dunn asserts as part of his discrimination claim that he was performing supervisory functions but that NCC did not give him supervisor pay. Dkt. 36. NCC argues that Dunn did not have supervisory-type responsibilities. Dkt. 31. NCC has met its burden of pointing to the absence of evidence and thereby shifting to the burden to Dunn to demonstrate by competent summary judgment proof that there is an issue of material fact. *See Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995). Dunn has not met his burden of showing there is an issue of material fact for trial, as he has not come forward with any evidence indicating what Coffman's responsibilities were and what Coffman's salary was.

Because Dunn cannot make out a prima facie case of pay discrimination, NCC's motion for summary judgment on that claim is **GRANTED**.

### 4. Disparate Treatment Regarding Discipline

Dunn contends that he was disciplined for minor infractions when Caucasian employees were not. Dkt. 1 at 10. NCC contends that Dunn does not identify these minor infractions and that, regardless, Dunn has not identified any Caucasian or non-African-American employees who were treated differently under similar circumstances. Dkt. 31 at 14. NCC asserts that Dunn's examples include a Hispanic employee being able to steal tools from the shop and an employee named Ray not having to clock in and clock out, but NCC asserts that Dunn was disciplined regarding clocking in and out because of "his defensive and uncooperative behavior when asked to adjust his time." Dkt. 31 at 14 (citing Dkt. 31, Ex. A-25). NCC points out that Dunn also admitted during his deposition that other employees were disciplined for violating company policy. Dkt. 31 (citing Dkt. 31, Ex. B (Dunn Dep.) at 232–34). In Dunn's deposition, he stated that an employee named

Cortes was written up for saying he "did not like working for black men." Dkt. 31, Ex. B at 232. He also testified that an employee named Damien "was an alcoholic" and that Dunn had to give Damien warnings for coming to work drunk. *Id.* at 233. Dunn hypothesized that if he had come to work drunk, he "would have been out the door," but he never came to work drunk. *Id.* at 234.

Dunn responds that summary judgment is precluded on his claim of disparate treatment as to disciplinary procedures because Dunn was disciplined for "the smallest of perceived infractions" yet other employees who were not members of the protected class were not disciplined when they did the following: (1) called Dunn a [racial slur] and asked if Dunn was a slave; (2) referred to Dunn as "Byron N," which allegedly stood for a racial slur; (3) called Dunn a "mayate," which allegedly is a racial slur in Spanish; (4) called Dunn a "monkey"; (5) asked a co-worker why Coffman hired Dunn's "black ass"; and (6) left the machine that Dunn was working on, resulting in Dunn being locked inside and having to bang on the machine to get help. Dkt. 36 at 24. Dunn, on the other hand, was disciplined for not completing a form after he was locked in the machine, which Dunn contends he was not required to do, and for "stealing time" by not clocking out when he had to leave for a transient ischemic attack. *Id.* Dunn contends that this is disparate treatment and it "does not have to arise from the exact same conduct." *Id.*

While the court agrees that the disparate treatment does not have to arise from the exact same conduct, the Fifth Circuit has "explained consistently that for employees to be similarly situated those employees' circumstances, including their misconduct, must have been 'nearly identical.'" *Perez v. Tex. Dept. of Criminal Justice*, 395 F.3d 206, 213 (5th Cir. 2004) (citations omitted). This does not mean "identical," which the Fifth Circuit has acknowledged "would be essentially insurmountable, as it would only be in the rarest of circumstances that the situations of two employees would be totally identical." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir.

2009).  It has explained that "[e]ach employee's track record at the company need not comprise the identical number of identical infractions, albeit these records must be comparable."  *Id.* at 261. "[T]he similitude of the employee violations may turn on the 'comparable seriousness' of the offenses for which discipline was meted out and not necessarily on how a company codes an infraction under its rules and regulations."  *Id.*  Here, there is no similarity in the infractions.  While the court finds it troubling that Dunn's coworkers were not disciplined when reports were made about racial comments, these comments simply cannot be compared to an issue with failing to clock out or an issue with failing to complete a form for being locked in a machine.  Thus, Dunn fails to make a prima facie case for discrimination based on disparate discipline.  NCC's motion for summary judgment on Dunn's disparate treatment claim with regard to discipline is **GRANTED**.

## C.    **Disparate Impact**

In his complaint, Dunn asserts that NCC implemented a program to discriminate against Dunn and that this program resulted in the promotion of a twenty-five-year-old Caucasian instead of Dunn and higher pay to white and non-African American employees in comparison to African Americans.  Dkt. 1 at 12.  NCC asserts that Dunn refers to "disparate impact practices" without pleading a disparate impact claim.  Dkt. 31 at 15.  To state a claim of disparate impact, a plaintiff must show "(1) a facially neutral policy; (2) that, in fact, has a disproportionately adverse effect on a protected class."  *Pacheco v. Mineta*, 448 F.3d 783, 791 (5th Cir. 2006).  Proof of discriminatory motive is not required.  *Id.*

NCC argues that Dunn cannot assert a separate claim for disparate impact because he has not exhausted his administrative remedies.  Dkt. 31 at 15.  It points out that only claims alleged in the EEOC charge or that could have reasonably grown out of the charge are exhausted and that Dunn's charge does not allege disparate impact or a neutral employment practice that resulted in a disparate

impact. *Id.* at 16. "Title VII requires employees to exhaust their administrative remedies before seeking judicial relief," and private-sector employees must do so by filing a charge with the EEOC. *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 273 (5th Cir. 2008).

Dunn argues that the EEOC charge is nondispositive. Dkt. 36 at 24. Dunn contends that he need not detail all the racial animus of his employer in the EEOC intake form or his discrimination charge. *Id.* at 25. He argues that NCC's handbook contains employment neutral policies, yet Dunn was treated differently than other employees from the beginning. *Id.* He states that "the racially based treatment resulted in disparate impact because African-Americans were excluded from this Department, and attempts were made to terminate Dunn." *Id.*

Dunn's argument appears to conflate disparate impact and disparate treatment claims. "Disparate-impact discrimination . . . addresses employment practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group." *Pacheco v. Mineta*, 448 F.3d at 787. Disparate impact claims do not require discriminatory motive. *Id.* The only policy or practice Dunn identifies is, in general, the employee handbook. He does not say which neutral policy in the handbook allegedly resulted in a disparate impact on African-American employees.

Additionally, Dunn did not exhaust his administrative remedies with regard to this claim. While the "scope on an EEOC complaint should be construed liberally" and courts "look slightly beyond" the "four corners" of the EEOC complaint "to its substance rather than its label," it must be sufficient to "trigger the investigatory and conciliatory procedures of the EEOC' for that claim. *Pacheco*, 448 F.3d at 788–89. "Courts should not condone lawsuits that exceed the scope of EEOC exhaustion, because doing so would thwart the administrative process and peremptorily substitute litigation for conciliation." *McClain*, 519 F.3d at 273.

Here, Dunn's EEOC charge stated that he was assigned supervisor responsibilities by his manager, but his title was never changed and he was never compensated as a supervisor. Dkt. 31, Ex. K. He stated that he was told there was no budget or that he would be scheduled for training when he would inquire as to why he had not yet been promoted. *Id.* He asserted that "several Caucasians with less experience and less responsibilities were promoted." *Id.* He then stated that he "asked if the lack of promotion was because I am black," and his supervisor said "it was racial." *Id.* He contended that he was retaliated against for contacting corporate about this discriminatory conduct and that his manager used a lock out violation as pretext. He also asserted that he was subjected to a hostile work environment and disparate treatment and that he was wrongfully discharged. There is nothing in the charge about a facially neutral policy and nothing that can be interpreted as a facially neutral policy. Instead, the charge asserted hostile work environment and intentional discrimination.

NCC's motion for summary judgment on the disparate impact claim is **GRANTED**.

**D.    Hostile Work Environment**

Dunn's next claim is for a hostile work environment under both Title VII and 42 U.S.C. § 1981. Dkt. 1. In his complaint, Dunn asserts he was falsely accused of stirring up problems and that he was intentionally locked in the cavity of a machine, causing him severe anxiety and panic. *Id.* He claims he was the recipient of racial jokes, racial epithets, threats of bodily injury based on his race, and racially insensitive derogatory remarks. *Id.* He contends the NCC failed to exercise reasonable care to prevent and correct the hostile environment. *Id.*

NCC moves for summary judgment on this claim, arguing that Dunn cannot establish a prima facie case of harassment and there is no evidence of pretext. Dkt. 31. Specifically, NCC asserts that Dunn cannot establish that the alleged harassment affected a term, condition, or privilege of

employment or that NCC knew or should have known about the alleged harassment by Dunn's coworkers.  Dkt. 31.

Dunn argues that the harassment was based on his race and resulted in the denial of a promotion, thus affecting a term or condition of his employment.  Dkt. 36.  Dunn contends that NCC knew or should have known about the harassment because he reported it to Coffman almost daily and also sent an unsigned email to corporate.  *Id.*  Additionally, he contends that he reported the "mayate" incident to Waggoner.  *Id.*

The court will first set forth the legal standard for a hostile work environment claim, and it will then address the parties' arguments.

### 1.     Legal Standard: Hostile Work Environment

To state a hostile work environment claim, Dunn must show that (1) he belongs to a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his membership in the protected class; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take adequate remedial action.  *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005).  The work environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S. Ct. 2275 (1998) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367 (1993)).  "In order to deem a work environment sufficiently hostile, 'all of the circumstances must be taken into consideration.'"  *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).  Only the fourth and fifth prongs are at issue here.

### 2.    Term, Condition, or Privilege of Employment

NCC argues that Dunn cannot establish that a term, condition, or privilege of employment was affected by the alleged harassment.  Dkt. 31.  For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir.2002)).  In determining whether an abusive work environment exists, a court must assess the totality of the circumstances, including:  (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23; *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 771 (5th Cir. 2009). In considering the factors, "[n]o single factor is determinative." *EEOC v. WC & M Enters., Inc.*, 496 F.3d 393, 399 (5th Cir. 2007)  Simple teasing, rude or offensive comments, or isolated incidents will not amount to actionable discrimination.  *Harris*, 510 U.S. at 21; *Hockman v. Westward Commc'ns, L.L.C.*, 407 F.3d 317, 326 (5th Cir. 2004).  Conclusory allegations of a hostile work environment will not suffice.  *Bryan v. Chertoff*, 217 F. App'x 289, 294 (5th Cir. 2007) (per curiam).

### a.    The Alleged Harassment

Dunn contends that the harassment he suffered was both severe and pervasive, citing the following incidents:

- In December 2103, an employee named Twee told Dunn that he "'did not know that black people work on machines.'"

- An employee named Boudreaux, who was the manager over programming, used a racial slur to describe Dunn and made derogatory remarks towards Dunn "[a]lmost every day."  Boudreaux also told Coffman in March 2014, when referring to Dunn, that he "got a smart [racially derogatory term] now."

- An employee named Dwight Cassell called Dunn "Great Ape."

- An employee named Jose Cortes "always made racial statements," including saying "'Burn this _____ your boss'" in January 2014. Dunn reported Cortes's behavior to Waggoner "when it got really bad."

- "Every person in Dunn's group made racial comments to Dunn."

- Dunn was trapped in a machine while Mario, a Hispanic co-worker, "went to horseplay." Dunn asserts that "[i]t can be inferred that race was the motivation in leaving Dunn unprotected in the machine."

Dkt. 36 at 27–28[8] (citing Dkt. 36, Ex. 14 (Dunn Dep.) at 45–47, 49, 52, 135, 145–46, 174–75, 194–95, 227–28).

With regard to being locked in the machine, NCC argues that "Dunn has created conflicting statements and representations in what is equivalent to a sham affidavit by representing in pleadings that being locked in the machine was intentional, and thus, is <u>not</u> in any way supportive of his harassment claim." Dkt. 31 at 18. With regard to being subjected to racial jokes, epithets, and derogatory remarks, NCC points out that Dunn asserted during his deposition that he documented it every time someone said a racial name or made a racial reference. *Id.* (citing Dunn Dep. 52–53). Yet, according to NCC, Dunn only documented two incidents—(1) that two employees said that if NCC hired Dunn's "black ass" they would quit because they were "Not working for that nigger"; and (2) a co-worked said that NCC could have hired Hispanic people to do the job. *Id.* NCC contends that Dunn's allegations about what Coffman said are hearsay and should not be considered as part of the racial harassment claims. Dkt. 31 at 18 n.12 (citing *Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 204, 2007 WL 1879157 (5th Cir. June 28, 2007)). NCC also addresses the other

---

[8] The court notes there are many other instances of coworkers allegedly using racial slurs or epithets in the cited pages of Dunn's deposition. *See* Dkt. 36, Ex. 14. Dunn cited only a sample of the instances when discussing the alleged harassment in his response.

comments, which it notes that Dunn brought up during his deposition even though he did not put these comments in his written report primarily because Dunn stated during his deposition that he left some of his notes in his desk. Dkt. 31 at 18–19 (citing Dunn Dep. at 158, 186). NCC contends that Dunn did not provide human resources with complaints about these alleged statements and that they do not establish a prima facie case of racial harassment. *Id.* NCC additionally argues that these alleged statements are not so frequent and severe as to create a hostile work environment, relying on *McCray v. DPC Industries, Inc.*, 942 F. Supp. 288, 292-93 (E.D. Tex. 1996)).

Dunn argues that the harassment was based on his race and resulted in a denial of his promotion, thus affecting the term or condition of his employment. Dkt. 36 at 29. He contends that the racial epithets and other racially derogatory comments were constant, almost daily, and were thus both severe and pervasive. Dkt. 36 at 27–28. He contends that Jose Cortes and Lupe Quesada "always made racial statements" and that he reported it to Waggoner "when it got really bad." *Id.* at 28 (citing Dkt. 36, Ex. 14 at 146 (Dunn Dep.)). Dunn asserts that "[e]very person in Dunn's group made racial comments to Dunn." *Id.* (citing Dkt. 36, Ex. 14 at 194–95). He also contends that "[i]t can be inferred that race was the motivation in leaving Dunn unprotected in the machine" because his co-worker who "went to horseplay" when Dunn was trapped is Hispanic. *Id.* Dunn contends that he took advantage of NCC's reporting procedure by reporting the harassment to Coffman almost daily, by sending an unsigned email to corporate, and by reporting the "mayate" incident to Waggoner. *Id.* at 29.

### b. Hearsay

The court will first address the hearsay issue. NCC, relying on *Russell*, argues that the court cannot consider Dunn's reports of what Coffman said because hearsay cannot be considered to support a harassment claim. Dkt. 31. In *Russell*, the plaintiff sued her former employer alleging,

among other claims, sexual harassment. *Russell*, 234 F. App'x at 198. In considering the plaintiff's

sexual harassment claim, the court noted that the evidence in the record that the alleged harasser had

negatively influenced the employment decision at issue was not admissible. *Id.* at 204. The plaintiff

had testified that a member of committee making the employment decision told the plaintiff that the

harasser, who was not on the committee, had said "really nasty things" about the plaintiff. *Id.* The

court, without analysis, held that this testimony was inadmissible hearsay and thus not competent

summary judgment evidence. *Id.*

In *Ramirez v. Gonzales*, 225 F. App'x 203, 2007 WL 329207 (5th Cir. Aug. 10, 2015) (per

curiam), a former employee of the United States Attorney's Office sued for discrimination and

retaliation after she was fired. 225 F. App'x at 205. The plaintiff attempted to link anti-union

comments made by her supervisor to the termination decision. *Id.* at 210. However, the evidence

of anti-union comments was from the deposition of the union president, who was recounting a

conversation with a legal secretary, who told the union president that the supervisor had a problem

with the plaintiff being a member of a union. *Id.* The Fifth Circuit ruled that the district court

properly excluded this statement as hearsay. *Id.* The plaintiff had argued that the statements were

admissible as statements of a party opponent, and the court noted that the remarks of the supervisor

to the secretary would probably fall within the party opponent exception. *Id.* (citing Fed. R. Evid.

801, 805). The court found that the secretary's remarks to the union president, however, did not fall

within the exclusion because they concerned matters outside the scope of her employment as the

union president was not involved in the decision to terminate the plaintiff's employment. *Id.* (citing

Fed. R. Evid. 801(d)(2)(D)).

Under Federal Rule of Evidence 801(d)(2)(D), a statement offered against an opposing party

that "was made by the party's agent or employee on a matter within the scope of that relationship and

while it existed" is not hearsay.  Under Rule 805, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Here, Dunn's reports of what Coffman said relating to why Dunn was not getting a promotion cannot be considered hearsay because they are statements of a party opponent.  Coffman was speaking in the scope of his relationship as Dunn's supervisor.  The statement that Currier made to Coffman is likewise not hearsay because it is a statement of a party opponent made within the scope of the employment relationship.  In *Russell*, the statements by the alleged harasser were likely not within the scope of her employment.  Here, the both statements were clearly about the promotion decision, and both speakers were within the scope of their employment in making the statements.  Because both statements fall squarely into a hearsay exception, to the extent NCC is objecting to this evidence as hearsay, that objection is **OVERRULED**.

   **c.**  **Analysis**

   The court now turns to whether the incidents were frequent and severe enough to create a hostile work environment.  NCC relies on *McCray*.  Dkt. 31.  In *McCray*, Judge Fisher in the Eastern District of Texas considered whether John E. McCray, an African American male, had sufficient evidence of racial harassment to survive summary judgment.  942 F. Supp. at 290.  McCray alleged, generally, that he was subjected to racial slurs, remarks, and jokes almost immediately after beginning employment.  *Id.*  He contended that a coworker told a racial joke in his presence, and another coworker called him a "God damned nigger."  *Id.*  Additionally, he claimed that his foreman told a racial joke about Rodney King twice in McCray's presence.  *Id.*  McCray reported the racial slurs to the operations manager, who called a meeting, told all employees that racial jokes, epithets, and comments were improper and threatened employees with a three-day suspension for making such remarks.  *Id.*  After this meeting, McCray claimed that his foreman called him "son" three or

four times, called him a "black yankee," and insulted Jesse Jackson, Malcolm X, and Martin Luther King, Jr. four or five times. *Id.*

McCray eventually wrote to a company vice president, who called a meeting with the foreman and operations manager and investigated McCray's claims. McCray's coworkers denied using racial epithets or telling racial jokes at work; the vice president advised them that such conduct was against company policy, but he did not take any disciplinary action because he could not confirm any of the complaints. *Id.* at 291.

The court noted that in order to prove hostile work environment under Title VII, a plaintiff must "'prove more than a few isolated incidents of racial enmity.'" *Id.* at 293 (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987)). It noted that "racial comments that are sporadic or part of casual conversation do not violate Title VII" and the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not affect the terms or conditions of employment to a sufficiently significant degree to violate Title VII." *Id.* It summarized that McCray claimed that three to five times during a year his supervisor called him "son" and "black yankee," insulted three black political leaders, and told a racial joke. Additionally coworkers told racial jokes and one called McCray a racial epithet. The court held that "[t]hese actions, while not commendable, are not so numerous and opprobrious as to constitute a hostile work environment" as the comments and jokes "were sporadic and merely part of casual conversation." *Id.*

Dunn relies primarily on *Jackson v. Quanex*. In *Jackson*, the Sixth Circuit noted that "simply teasing, offhand comments, and isolated incidents ordinarily do not amount to discrimination under Title VII," but instructed that "an abundance of racial epithets and racially offensive graffiti could hardly qualify as offhand or isolated. Rather, such continuous conduct may constitute severe and

44

pervasive harassment." 191 F.3d at 662. The hostile environment in *Jackson* included the plaintiff hearing two supervisors "discussing their desire to fire minority employees and the idea of placing stars on their helmets for each minority fired;" numerous reports by African-American coworkers of the use of racial slurs or inappropriate racial comments in the workplace; the plaintiff's supervisor telling her during a meeting that the company was "up to our asses in nigger sludge"; and the plaintiff seeing graffiti in the women's rest room comparing the sizes of the genitalia of black and white males and graffiti depicting lynchings and the phrase the "KKK is back." *Id.* In *Jackson* the plaintiff had numerous other African American coworkers who could back up her story about the hostile environment. In this case, Dunn was the only African American at the facility.

This case rests somewhere between *McCray* and *Jackson*. In *McCray*, the allegations of a hostile work environment were too generalized. In *Jackson*, there were substantial allegations that were backed up by coworkers. Here, there are reports that are much more specific than the reports in *McCray*, but there is not additional evidence from coworkers of a hostile environment. The court finds that this is a close call. The court therefore resolves any disputes in favor of the plaintiff and finds that there are issues of material fact with regard to this element.

### 3. Employer Knew or Should Have Known

NCC also argues that, regardless, Dunn cannot establish that NCC knew or should have known about these allegations and yet failed to do anything. Dkt. 31 at 20. NCC contends that Dunn must be able to show that he availed himself of the corrective opportunities provided by NCC because Dunn received access to the handbook, which includes an anti-harassment and problem solving procedure policies. *Id.* at 20–21 (citing *May v. Fedex Freight E., Inc.*, No. 09-30872, 2010 WL 1141653, 274 F. App'x 510 (5th Cir. May 22, 2010) (per curiam)). According to NCC, the policies direct employees to contact human resources for assistance in resolving issues. *Id.* (citing

45

Dkt. 31, Exs. A-1, A-2). NCC points out that Dunn also watched an anti-harassment video that instructed employees to contact human resources if the employee believed he or she was being harassed. *Id.* (citing Dkt. 31, Ex. A-3, Dunn Dep. at 154-55). NCC contends that it is clear that Dunn knew that this was the proper procedure for raising complaints because Dunn complained to human resources about a non-race-related conflict with a co-worker. *Id.* at 21. NCC argues that Dunn's assertion that he initially told only Coffman about the racial comments is evidence that Dunn was not following NCC's policy. *Id.* (citing Dunn Dep. at 65, 137–38, 141, 148). NCC contends that it took Dunn's allegations seriously when he finally complained to corporate as is evidenced by Waggoner promptly arranging a meeting with Dunn. *Id.* (citing Waggoner Aff. ¶ 32).

Dunn first responds to these arguments by stating that the *Faragher* defense does not apply because he took advantage of NCC's reporting procedure. Dkt. 36 at 29. In *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S. Ct. 2275 (1998), the U.S. Supreme Court held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee, [but] [w]hen no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." NCC raises the *Faragher* defense in its answer, but it does not raise it in its motion for summary judgment or its reply. *See* Dkts. 17, 31, 44. Thus, the court will not address *Faragher* and instead rely only on the arguments that Dunn cannot establish a prima facie case for his hostile work environment claim, including the prong that requires Dunn to show that the employer knew or should have known of the harassment and failed to take adequate remedial action.

Dunn next argues that he reported the harassment to Coffman "almost daily," reported the harassment anonymously by sending an email to corporate, and reported the "mayate" incident to Waggoner. Dkt. 36 at 29.

NCC asserts, in reply, that reporting to Coffman does not comply with the procedures, as the anti-harassment policy, which Dunn reviewed with Waggoner, directs employees to report matters to human resources. Dkt. 44. It argues that Dunn's email to corporate does not describe the almost daily race-based harassment about which he now complains. *Id.* As far as Dunn's assertion that he reported the "mayate" incident to Waggoner, NCC notes that Dunn himself acknowledged that Waggoner had addressed the issues raised in their meeting and did not mention "mayate." *Id.* (citing Dkt. 31, Ex. G-1 at 28–29, 48).

The court will first discuss the main cases relied upon by NCC for this prong. It will then review what NCC's policy requires. Then, it will address whether Dunn's reports to Coffman were in compliance with that policy and whether the report to Waggoner and email to corporate were sufficient to put NCC on notice.

### a.   Caselaw

NCC relies primarily on *May v. Fedex Freight East, Inc.* In *May*, the Fifth Circuit found that an employee's report that she told her immediate supervisor that she had been subjected to sexual harassment was insufficient to put the employer on notice. *May*, 374 F. App'x at 512. The court stated that it "has long recognized that in order to demonstrate that an employer has failed to take prompt remedial action, the employee must first show that she took 'advantage of [the] corrective opportunities provided by the employer.'" *Id.* (quoting *Harvill*, 433 F.3d at 437). Since the employer's policy, with which the employee was aware, required reports be made to the managing

supervisor, not the immediate supervisor, the plaintiff could not prove the employer failed to take remedial action. *Id.* at 513.

In *Harvill*, the Fifth Circuit first noted that the sufficiency of an employer's response necessarily depends on the facts of each case. 433 F.3d at 437. It instructed that once a company is informed, it must take prompt remedial action that is reasonably calculated to end the harassment. *Id.* It also instructed that the employee must take advantage of the corrective opportunities that the employer offers. *Id.* However, the employee is not required to bring subsequent complaints if the employee believes it would be futile or it appears obvious the employer "'has no real intention of stopping the harassment.'" *Id.* (quoting *Woods v. Delta Beverage Grp., Inc.*, 274 F.3d 295, 300–01 (5th Cir. 2001)).

In *Harvill*, the Fifth Circuit determined that even though the plaintiff had complained to her supervisor, since the company's policy instructed her to go to human resources if the matter was not resolved by the supervisor, and the plaintiff did not do so, she failed to take advantage of corrective opportunities and thus failed to establish the final prong of her hostile work environment claim. *Id.* at 438–39. In making this determination, the court was unconcerned with testimony that the plaintiff and a co-worker had both been advised by their supervisor never to go over the supervisor's head on any matters. *Id.* at 438.

Here, NCC takes issue because Dunn claims that he, like the plaintiffs in *May* and *Harvill*, reported the harassment to his supervisor and did not report in accordance with the company's policy. There was no dispute in *May* or *Harvill* that the policies required reporting to somebody other than the supervisor. Here, Dunn contends his reports to Coffman were sufficient. Dkt. 36.

### b.     The Policy

Dunn received the employee handbook, including the anti-harassment policy.   Dkt. 31,

Ex. A-1.  The anti-harassment policy states that an

> employee who feels that he or she is a victim of unlawful harassment
> based upon any protected class or characteristic . . . by any supervisor,
> management official, other employee, customer, supplier or any other
> person in connection with employment at the Company, is
> encouraged to immediately inform the alleged harasser that the
> behavior is unwelcome.  If informal discussion is unsuccessful in
> remedying the problem or if such an approach is not possible, the
> employee must immediately report the matter to the division's
> Human Resources Department or a Director of the Company.

Dkt. 31, Ex. A-2.  The policy submitted by NCC as an exhibit also includes a "problem solving

procedure" page that provides the following steps:

> Step One: Discuss the problem with your immediate supervisor.  If
> this does not provide satisfaction, or if your immediate supervisor is
> part of the conflict, go to Step Two.
> Step Two: Discuss the problem with your immediate supervisor and
> a Production Supervisor or divisional manager.  If this does not
> provide satisfaction, go to Step Three.
> Step Three: If your problem is not resolved after Step One and Step
> Two, you are encouraged to request a meeting with the Human
> Resources Department.

Dkt. 31, Ex. A-2.  After discussing retaliation and anonymous letters, which the problem solving

procedure page states the company will not investigate, the procedure requires:

> **ANY PROBLEM INVOLVING SAFETY OR HARASSMENT
> MUST BE REPORTED IMMEDIATELY TO A
> MANAGEMENT TEAM MEMBER, OR TO THE HUMAN
> RESOURCES DEPARTMENT.  THE COMPANY CANNOT
> CORRECT ISSUES THE COMPANY IS NOT AWARE OF.**

*Id.*

### c. Did Dunn Comply with the Policy?

NCC argues in its reply that Dunn did not comply with NCC's procedure for lodging a complaint because he reported the harassment to his supervisor rather than human resources. Dkt. 44 at 10. However, NCC's policy is not completely clear regarding the reporting procedure. The "anti-harassment policy" page states that the employee "must immediately report" harassment to human resources or a director if informal means do not work. Dkt. 31, Ex. A-2 at NCC 000127. But the "problem solving procedure" page states that problems should be discussed with managers first and that the employee "is encouraged to request a meeting" with human resources if discussing it with the manager does not work. *Id.* at NCC 000159. The imperative is missing in the problem solving procedure, and the initial meeting with the supervisor is missing from the anti-harassment policy page. The bold-face summation on the problem solving procedure page states that the employee must report any problem involving harassment to a management team member *or* human resources. *Id.*

It is clear that if Dunn reported harassment on an almost daily basis for the six months he was employed and the harassment was still occurring, Dunn did not get immediate relief from his supervisor. Thus, under the procedure, his next step would be to go up the line. However, Dunn's supervisor allegedly told him that he had been told to get rid of Dunn's "black ass" by the people in charge of promotions. In *Harvill*, the court did not believe the employee had a sufficient excuse not to comply with the procedure just because her direct supervisor had told her not to go to human resources. Here, however, taking the facts in the light most favorable to Dunn, Dunn had a reason to believe that any complaints to individuals who he perceived to have racial animus would be futile.

Dunn eventually sent two emails to the corporate office in June. Dkt. 31, Exs. A-20, A-21. Dunn's notes outlining various office happenings from May 23, 2014, through June 13, 2014, are

attached to one of the emails. Dkt. 31, Ex. A-20. These notes primarily about other issues in the workplace, but Dunn notes that on June 9, 2014, Coffman told him that a young Caucasian person with no experience was promoted in another department despite there being an African-American with experience in that department, to which Dunn opined in his notes that "if you have knowledge and you are of a color; your chances of being promoted are slim to none." Dkt. 31, Ex. A-20 at NCC 000334. He also stated in these notes that it was difficult to work at NCC because of the "hostile environment." *Id.* (June 13, 2014 entry). In the other email, Dunn stated that he felt "that it needed to be addressed to someone outside this facility, that is neutral." Dkt. 31, Ex. A-21.

The corporate representative appears to have forwarded the emails back to the local facility, and Waggoner stated that she would meet with Dunn the next Monday. Dkt. 31, Exs. A-20, A-21. Waggoner immediately emailed Dunn and told him that the company takes "this very seriously" and said they would "address it on Monday" when everyone was back in the office. Dkt. 31, Ex. A-22. Dunn met with Waggoner and Dane Tipton, who according to Dunn's note is the "president," on or about June 17, 2014, and Dunn recorded the conversation. Dkt. 31, Exs. F, G-1. Dunn asserts that Waggoner and Tipton attacked him for getting corporate involved. Dkt. 31, Ex. F. During his conversation, Dunn stated that he contacted corporate because he "felt that it was the right thing to do because [he] had nobody else." Dkt. 31, Ex. G-1 at 107. He indicated that he did not "like coming to human resources" and that he thought that things had gotten worse since he had talked with Waggoner. Dkt. 31, Ex. G-1 at 5. Later in the conversation, Dunn noted that he had talked to his manger and Waggoner told him that there were people above that and reminded him that they had discussed that during orientation. *Id.* at 22. Tipton told Dunn that he "took their cards" away from them and did not give them the opportunity to correct things. *Id.* at 23. He stated, "I have a big issue with that." *Id.* He reminded Dunn that "if there's an issue, these two doors are always

open." *Id.* at 23–24. He then told Dunn that now that he had "played this card" they had to "do a complete investigation of everybody." *Id.*

Dunn's employment, however, was terminated about a week later because, according to the separation notice, Dunn "refused to cooperate in 3 separate investigations and insubordinate to mgt!" Dkt. 31, Ex. A-30. Thus, while the employer's response was certainly prompt upon receiving these complaints, there can be no determination regarding whether remedial action was reasonably calculated to end the harassment.

NCC asserts Dunn should have reported the harassment to Waggoner, and Dunn contends that he did report the "mayate" incident to Waggoner and she did nothing. In his deposition, Dunn testified:

> Q: So did you ever go report to Jennifer Waggoner any of the racial comments?
> A: Yes. One time. Just one time when it really bad with Joe.
> Q: June.
> A: June.
> Q: And prior to that, you never went to Jennifer Waggoner in Stafford discussing any of these racial statements that people were making; correct?
> A: No. I went to John, because he told me that he would take care of it. I didn't want any problems.

Dkt. 31, Ex. B at 146–47. During the deposition, Dunn also discussed a meeting he had with Waggoner, Coffman, Lupe, and Cortes in May 2014:

> Q: Did you meet with Ms. Waggoner, Mr. Coffman, Lupe, Cortes, and yourself in May?
> A: Yes.
> Q: Okay. Did you bring up any racial comments in that conversation?
> A: That meeting wasn't – wasn't about – that meeting was to let them know I was supervisor.
> Q. Okay. So – so you (Inaudible)?
> A: It was – John [Coffman] – John asked me a question. He said – he asked me whether I have a problem with people in the shop – (Inaudible) in the shop. And I said yeah, Lupe going around

> spreading rumors and he keeps calling me "mayate." And John looked at Jennifer and wrote it down. (Inaudible) with Lupe is because he'd been there since – about 35 years.

*Id.* at 149. He further explained:

> I said, "Yeah, I keep – I'm tired – I'm tired of Lupe calling me "mayate" and always saying one thing to Cortes – to tell Cortes that – or writing him up or do anything to Cortes to make him upset." So that's one of the things I told Jennifer [Waggoner] and John [Coffman] . . . .

*Id.* at 150. Dunn contends that Waggoner asked him what the word meant and that he told her it means "nigger." *Id.* at 150–51. Dunn stated that Waggoner just "kind of smirked" when he made that report and that she did not follow up on the complaint. *Id.* at 151.

NCC contends that the transcript of a recorded conversation between Dunn, Waggoner, and Tipton demonstrates that Waggoner had addressed the issues raised in their meeting and there was no mention of the word "mayate."

> MS. WAGGONER: –not give us another – why didn't you come and ask if any of that was true? Why didn't you come and talk to me and say, "What is specifically (unintelligible)?"
> MR. DUNN: Hey, I came up here before.
> MS. WAGGONER: And I --
> MR. DUNN: I came.
> MS. WAGGONER:  – addressed it immediately.
> MR. DUNN: Right after that it went right back to the same thing.
> MS. WAGGONER: Did anybody come back to me and say what was working --
> MR. DUNN: No.
> MS. WAGGONER: – or not working?
> MR. DUNN: No.
> MS. WAGGONER: So how should I have known about any of that?

Dkt. 31, Ex. G at 48–49.

The transcript does not actually provide any lucidity regarding what Dunn reported to Waggoner or what she did to remedy the problem. What it shows is that Dunn reported something,

Waggoner took some action, and Dunn did not believe the action she took cured the issue. The court finds that there is a question of material fact as to what Dunn reported to Waggoner, what she did to remedy the situation, and whether it was effective. Additionally, viewing the facts in the light most favorable to Dunn, the court finds that a reasonable juror could find that it was reasonable for Dunn to believe reporting future harassment to Waggoner would be futile.

Because there are questions of material fact as to both the elements in dispute, NCC's motion for summary judgment on Dunn's hostile work environment claim is **DENIED**.

## E. Retaliation

Dunn asserts in his complaint that after he sent the email to the corporate office detailing racial discrimination, hostile work environment, and disparate treatment, Coffman retaliated against him and "nitpicked" him. Dkt. 1 ¶ 44. He contends that he was wrongfully accused of not checking the log and that Coffman "ranted racial slurs only to realize that his rants were not justified, once he discovered that [Dunn] actually checked the logs." *Id.* He contends the report to corporate was a protected activity under Title VII and § 1981. *Id.* He asserts that there is a close causal connection between this report and the adverse actions he suffered which include denial of promotion and pay increase and denial of leave. *Id.* ¶ 45.

NCC contends that summary judgment should be granted in its favor on Dunn's retaliation claim because Dunn cannot establish a prima facie case of retaliation and also cannot establish pretext. Dkt. 31. NCC argues that Dunn cannot make out a prima facie case on his retaliation claim because he cannot establish that he was subject to an adverse employment action or that a causal connection exists between his complaint and the alleged adverse action. *Id.* at 22. NCC notes that Dunn's complaints about being "nitpicked" after complaining to the corporate office do not rise to an adverse employment action. *Id.* It contends that Coffman merely asked Dunn to comply with

NCC policies. *Id.* NCC argues that Dunn cannot assert that being denied a promotion is an adverse employment action because there was no promotion available and Dunn did not apply for a promotion. *Id.* at 23 (citing Waggoner Aff. ¶¶ 18–19).

NCC also argues that Dunn cannot establish a causal connection between his emails to corporate and his denial of promotion. Dkt. 31 at 23. It points out that Dunn testified that Coffman informed him that he would not be promoted in two different conversations–one in March 2014 and one in May 2014—both of which are *before* he sent the complaint to corporate on June 13, 2014. *Id.* (citing Dunn Dep. at 51–52 and Ex. M).

Dunn argues in his response to the motion for summary judgment that "[d]emanding employment opportunities as a supervisor to which [Dunn] was groomed is protected activity." Dkt. 36 at 30. Dunn states that he reported discrimination in June 2014, and the discrimination was not getting a promotion. *Id.* Coffman told him it was racial. *Id.* Dunn also asserts that he met with Waggoner in June 2014 and reported the racial comments, including Lupe Quezada calling him a "mayate." *Id.* Dunn contends that Coffman told Dunn he would get a supervisor position in early June (citing Ex. 14 at 183) and instead he was terminated on June 20, 2014, after he contacted corporate to report the discrimination. *Id.* He argues that *the termination* is the adverse employment action. *Id.* Dunn additionally argues that only a minimal showing of a causal link is needed, and the close timing between his protected activity and termination provides the necessary connection. *Id.* (citing *Evans v. Houston*, 246 F.3d 344, 352 (5th Cir. 2001)*; Bauer v. Albernale Corp.*, 169 F.3d 962, 966 (5th 1999); *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997)).

In reply, NCC first argues that the adverse employment action in Dunn's response is different than the adverse employment action alleged in the complaint and that Dunn should not be permitted to replead his complaint and allege a completely different adverse employment action just because

NCC established that his initially asserted reasons were invalid.  Dkt. 44.  NCC argues that, regardless, Dunn has no evidence that NCC's reasons for terminating Dunn's employment were pretext.  *Id.*

### 1.    Legal Standard: Retaliation

In a retaliation case, a plaintiff "must show that (1) he engaged in conduct protected by Title VII; (2) he suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action." *Jenkins v. City of San Antonio Fire Dep't*, 784 F.3d 263, 269 (5th Cir. 2015).  If the plaintiff meets this requirement, the burden shifts to the defendant to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004).  The plaintiff then assumes the burden to present proof that the employer's stated reason is pretextual.  *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  Under this framework, the employee's ultimate burden is to prove that the adverse employment action taken against the employee would not have occurred "but for" the protected conduct. *Pineda*, 360 F.3d at 487.  In other words, "even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Long*, 88 F.3d at 305 n.4 (5th Cir.1996).  An employee's subjective belief that an employer's decision is motivated by discrimination is not sufficient evidence of pretext. *Septimus v. Univ. of Hous.*, 399 F.3d 601, 610 (5th Cir. 2005).

An employee engages in protected activity if she "oppose[s] any practice made an unlawful employment practice" under Title VII.  42 U.S.C. § 2000e–3(a).  "For an employer's act to qualify as a materially adverse action, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded

a reasonable worker from making or supporting a charge of discrimination.'" *Cabral v. Brennan*, 853 F.3d 763, 767 (5th Cir. 2017) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006) (citation and internal quotation marks omitted)). As far as causation, "(1) to be persuasive evidence, temporal proximity must be very close, and importantly (2) temporal proximity alone, when very close, can in some instances establish a *prima facie* case of retaliation; . . . [however,] temporal proximity standing alone can[not] be sufficient proof of but for causation."[t]emporal proximity alone is insufficient to prove but for causation." *Strong v. Univ. Healthcare Sys. L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

### 2.      Adverse Employment Action and Prima Facie Case

First, as NCC appears to concede, if the court accepts the adverse employment action discussed in the response, then there appears to be a prima facie case. While the court agrees that Dunn's plain assertion of an adverse employment action under the "retaliation" cause of action in his complaint is different than the adverse employment action he alleges in his response, the court finds that, reading the complaint as a whole, it can be construed broadly enough to allege that the termination was also in retaliation for Dunn's reports. The evidence, construed in the light most favorable to Dunn, demonstrates that Dunn complained to Waggoner about at least the "mayate" incident and he sent the emails to corporate alleging that "[i]t is for sure, that if you have knowledge and you are of color; your chances of being promoted are slim to none." Dkt. 31, Ex. A-20. Though Dunn did not sign the emails, he sent them from his email address and corporate easily ascertained who he was. Thus, taking the facts in the light most favorable to Dunn, the emails were actual complaints by Dunn to management of unlawful activity (failing to promote individuals merely because they were members of a protected class). They were in very close temporal proximity to

Dunn's termination, and the termination is unquestionably an adverse action. Accordingly, Dunn has established a prima facie case of retaliation.

### 3. Legitimate Non-Discriminatory Reason

NCC argues, however, that it had a legitimate, nondiscriminatory reason for terminating Dunn's employment, and Dunn cannot show that its reason is pretext and that the retaliation is the but-for case of his termination. Specifically, NCC asserts that if Dunn contends that the adverse action is his termination, its nondiscriminatory reason for the termination is Dunn's failure to participate in three ongoing investigations and insubordination. Dkt. 31 at 24 (citing Ex. A-29). These are the reasons cited in Dunn's separation notice. Dkt. 31, Ex. A-29. In Waggoner's affidavit, she states that she met with Mr. Tipton and Hillary LaManna, the former General Manager of human resources, to discuss Dunn's conduct. Dkt. 31, Ex. A ¶ 37. Waggoner states that during this meeting they "determined that [Dunn's] employment should be terminated because he had not cooperated in the investigation into his Near Miss incident, the harassment allegations he initiated, or the incident regarding his clock in and clock out." *Id.* ¶ 38. There is some evidence in the record regarding this failure to cooperate. *See* Dkt. 31, Ex. A-14 (statement from James Vau regarding his attempt to interview Dunn about the near miss, in which Vau reports that Dunn walked out of his door saying "F this"); Dkt. 31, Ex. A-26 (statement signed by Dunn and Coffman in which Coffman reports that, when Coffman and James Vau attempted to talk to Dunn about failing to clock out, Dunn "became defensive about the questioning and was uncooperative"). The court finds that NCC's purported reason for the termination is a legitimate, nondiscrimnatory reason to terminate Dunn's employment.

### 4. Pretext

The question is, however, whether NCC's purported reason is the real reason or whether there

is enough evidence in the record to create an issue of material fact as to whether this reason is mere pretext and the real reason Dunn's employment was terminated is because he complained about discriminatory treatment. The court finds that the timing of the termination combined with the other evidence in the record about the employer desiring to terminate Dunn's "black ass" and being somewhat perturbed that Dunn "took their cards away from them" by reporting to corporate could lead a reasonable jury to conclude that the real reason Dunn was fired *at the time he was fired* was because he complained about discriminatory treatment.

The court finds there is a question of material fact in regard to whether Dunn's termination was in retaliation for his reports about discrimination. Accordingly, NCC's motion for summary judgment on Dunn's retaliation claim is **DENIED**.

## IV. CONCLUSION

Dunn's objections (Dkt. 36) are SUSTAINED IN PART and OVERRULED IN PART. Dunn's objection to NCC's Exhibit A-9 is SUSTAINED, and the court did not consider Exhibit A-9 when ruling on NCC's motion for summary judgment. Dunn's objections to NCC's other exhibits are OVERRULED.

NCC's motion for summary judgment (Dkt. 31) is GRANTED IN PART and DENIED IN PART. NCC's motion for summary judgment with regard to Dunn's discrimination claim for failure to promote, hostile work environment claim, and retaliation claim is DENIED. NCC's motion for

summary judgment with regard to Dunn's discrimination claims for pay discrimination and disparate treatment with regard to discipline and Dunn's disparate impact claim is GRANTED. These claims are DISMISSED WITH PREJUDICE.

Signed at Houston, Texas on December 21, 2017.

_____
Gray H. Miller
United States District Judge